ROBERT N. WEAVER, ESQ. (SBN 78528)
**LESS & WEAVER**
ATTORNEYS AT LAW
SUTTER PLAZA
1388 SUTTER STREET, SUITE 800
SAN FRANCISCO, CALIFORNIA 94109-5453
TEL 415/398-9800 • FAX 415/989-0841

GUY KORNBLUM, ESQ. (SBN 39974)
DAN G. BERRIS, ESQ. (SBN 269479)
Guy Kornblum & Associates
1388 Sutter Street, Suite 820
San Francisco, CA 94109

Attorneys for
FREDERICK C. FIECHTER

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: <br><br> Carl Alexander Wescott and <br> Monette Rosemarie Stephens <br><br> Debtors <br><br>——————————————— <br><br> Frederick C. Fiechter <br><br> Plaintiff <br> v. <br><br> Carl Alexander Wescott and <br> Monette Rosemarie Stephens <br><br> Defendants. | Case No. 12-30143 DM <br> Chapter 7 <br><br> Hon. Dennis Montali <br><br><br> Adversary Proceeding No. _____ <br><br> **COMPLAINT TO DETERMINE** <br> **DISCHARGEABILITY OF DEBT** <br><br> (11 U.S.C. §§ 523(a)(2)(B) & 523(a)(4)) |

Frederick C. Fiechter, a creditor herein, now files his complaint to determine dischargeability of debt and to seek denial of discharge and states as follows:

**JURISDICTION AND VENUE**

1. Jurisdiction is vested in this Court by provisions of 28 U.S.C. §157, 28 U.S.C. §1334(b), and 11 U.S.C. §523.

2. This is a core proceeding related to the determination of dischargeability of debt pursuant to 28 U.S.C. §157(b)(2)(I), and seeking the denial of discharge pursuant to 28 U.S.C. §157(b)(2)(J).

3. Plaintiff holds claims against the debtor and defendants.

4. Venue in this District is proper pursuant to 28 U.S.C. § 1409(a).

**PARTIES**

5. The debtors, Carl Alexander Wescott and Monette Rosemarie Stephens, are, and at all times relevant herein were, husband and wife residing in San Francisco, California.

6. At all times hereinmentioned, and in doing the things complained of, Debtor Carl Alexander Wescott (**"Wescott"**) was a real estate broker licensed by the State of California and/or held himself out to Plaintiff as a licensed real estate broker and as a licensed securities sales person with broker dealer licenses (Series 22, 63, 24).

7. Plaintiff Frederick C. Fiechter (**"Fiechter"**) is a creditor of the Debtors and owed money pursuant to a judgment entered in his favor against Debtor Carl Alexander Wescott in the amount of $1,275,573.31 (plus additional interest from June 15, 2011) by the District Court of the State of Nevada, Douglas County, on August 5, 2011, and later entered as a sister-state judgment in the California Superior Court, in and for San Francisco, on August 26, 2011 in the amount of $1,305,058. The judgment is based on a transaction whereby Fiechter was induced by Wescott to transfer 162 Glen Court, Stateline, Nevada to Wescott in exchange for promises and an unsecured promissory note from Wescott in the amount of $1,050,000.

8. Plaintiff Frederick C. Fiechter is a further creditor of the Debtors and owed additional money as follows: $564,516 principal pursuant to a Promissory Note dated May 7, 2008 with accrued interest (at 10% simple) of $186,490; and a $55,000 profit share from a joint venture loan retained by Wescott on or about September 2, 2008 with accrued interest (at 10% simple) of $19,954.

9. Plaintiff Fiechter is, and at all times relevant was, a resident of San Francisco, California.

# FACTUAL BACKGROUND

10. Fiechter was introduced to Wescott in 2006 while Fiechter was searching for a second home in Sonoma County. Wescott acted as Fiechter's real estate broker and earned a commission on the sale during or about November 2006. Wescott subsequently acted as Fiechter's broker and earned a second commission when Fiechter purchased a home in San Francisco. At all times mentioned herein, Wescott held himself out as a wealthy and successful investor with substantial real estate holdings and income adequate to repay Fiechter for debts incurred as stated below in more detail.

11. In the course of representing Fiechter and closing the Sonoma County purchase, Wescott advised and represented to Fiechter that he was involved in other business and development ventures and that the ventures presented investment opportunities to Fiechter. In particular, in November 2006 Wescott approached Fiechter for a $200,000 loan to fund various real estate projects at an 18.5% interest rate, which was the same rate Wescott indicated was being paid to him on money owed to him. The loan was made and the principal and interest were paid in full on February 20, 2007.

12. Less than a month later, Wescott approached Fiechter for a second loan, this time for $400,000 and once again at an 18.5% interest rate. Fiechter made the loan and took back a note dated March 20, 2007, due and payable June 2007 (**the "March 2007 Note"**). Wescott repaid $250,000 of the principal but the remaining principal of $150,000 was unpaid along with all the interest. Eventually interest or $33,246 was paid, but no further principal or interest was ever paid.

13. In November 2007 Wescott proposed that Fiechter fund a loan (or investment) of $110,000 to a developer in Florida with Wescott acting as licensed real estate professional. As proposed by Wescott, after repayment of principal additional proceeds would be shared 50/50. Fiechter funded the loan and it was presumably paid to the Florida developer on terms negotiated by Wescott. On or about May 2008 the Florida developer repaid $250,000 to Wescott, who repaid Fiechter the principal amount of $110,000, $15,000 of Fiechter's $70,000 profit split and gave Fiechter a check for the balance the profit split ($55,000). Before Fiechter was able to negotiate the

check, Wescott advised Fiechter that he had spent the money and that it was not available to Fiechter. The $55,000 profit split (hereinafter, **the "Florida Profit Split"**) has never been paid.

14. In February 2008 Wescott approached Fiechter to borrow an additional $400,000 from Fiechter and offered to pay 18.5% interest, and advised Fiechter that the rate was identical to what Wescott was collecting on money owed to him on other investments or loans. Concurrently with the request, or shortly thereafter, and at Fiechter's request, Wescott gave Fiechter a **first written statement of assets** wherein he represented, in writing, that he had "over 70 properties free and clear overseas [valued] over $10 mil." and "U.S. Properties for over $12.5 mil. equity" with a total "real estate equity of over $22.5 mil." In reliance on the representation of financial wealth, and Wescott's represented ability to repay Fiechter's loans, Fiechter loaned Wescott an additional $400,000 on or about February 14, 2008 and was given a promissory note payable on or before March 31, 2008 with interest at 18.5% per annum (**the "February 2008 Note"**). No payment has ever been made on the February 2008 Note.

15. During May 2008 Fiechter entered negotiations with Wescott to address the outstanding balance owed on the March 2007 Note and the unpaid February 2008 Note. In the course of these negotiations Wescott gave Fiechter a **second written financial statement**, this one dated April 17, 2008. This statement showed numerous assets with a total value of $39,461,275, and liabilities of $11,198,156 for a net worth of $28,253,119. At the request of Wescott, and in reliance on his representation of a net worth in excess of $28 million, Fiechter agreed to extend Wescott additional time to repay the March 2007 Note and February 2008 Note and renewed the debt by means of a new promissory note dated May 7, 2008 (**the "Consolidated Note"**) for the combined unpaid principal of $550,000 and accrued interest to the date of the Consolidated Note in the additional amount of $19,901. The Consolidated Note for $569,901 was payable in full on July 15, 2008. $5,385 of the principal has been paid on the Consolidated Note, reducing principal to $564,516, and partial interest payments were made from May 2008 through December 2008 totaling $36,703. The Consolidated Note provides, *inter alia*, that reasonable attorneys fees and costs incurred in connection with the collection or enforcement of the Note are recoverable.

- 4 -

16. On or about July 3, 2008 Wescott gave Fiechter a **third written financial statement**. This statement was dated May 14, 2008 and listed numerous assets, both domestic and foreign, with a purported value of $87,764,190, and liabilities of $36,417,357, for a total net worth of $51,346,834. Attached to the written financial statement, Wescott also provided a "Real Estate Cash Flow Statement" which showed that Wescott estimated his 2008 net income to be $3,987,151.

17. At or about the time the Consolidated Note matured on July 15, 2008, Wescott assured Fiechter that it would be paid in the "near future" and that Fiechter should not be concerned because of Wescott's substantial assets and income. Wescott also assured Fiechter that he would continue to receive interest. At or about that time, Wescott provided Fiechter with the May 14, 2008 written financial statement which Fiechter believed to be accurate and more than adequate to assure repayment of the money borrowed by Wescott. In reliance on Wescott's assurances of payment and on the accuracy of the May 14, 2008 financial statement, the previous financial statements and the "Real Estate Cash Flow Statement," Fiechter informally extended the payment date on the Consolidated Note to an indefinite future date.

18. During or about September 2008, when Wescott advised Fiechter that $55,000 of Fiechter's Florida Profit Split had been spent by Wescott and could not be paid, Wescott indicated to Fiechter that the sum would be added to the Consolidated Note and paid when the note was paid in full. In reliance on the continued assurances of repayment and on the written financial statements received from Wescott, Fiechter accepted the proposal.

19. On or about January 20, 2009 Wescott gave Fiechter a **fourth written financial statement**. This Statement was dated September 30, 2008 and listed numerous assets, both domestic and foreign, with a purported value of $109,910,620, and liabilities of $47,234,790, for a total net worth of $62,675,831.

20. Before October 2008 Fiechter owned and sold 162 Glen Court, Stateline, Nevada to a third party and took back a secured promissory note for around $1 million. In October 2008 the third party had defaulted on the note and Fiechter and the buyer were in discussion on how to address the debt and property. Fiechter eventually took ownership, and did so free and clear of any debt. Fiechter approached Wescott, as his real estate broker, to advise him concerning taking title

- 5 -

and re-selling to two individuals under a tenant in common strategy proposed by them, selling to one of the two interested individuals, listing the property for sale on the open market, renting it as a Tahoe vacation rental, or holding it for resale when the market was better.

21. Wescott suggested and advised Fiechter of an alternative strategy for 162 Glen Court whereby Fiechter wouldn't have to take the risk of managing the property or holding it until the market got better. Wescott proposed that Fiechter transfer ownership to him and he would hold the property for resale at a convenient time, guaranty payment to Fiechter of $1,050,000 within one year, and that if he was able to obtain financing on the property after ownership was transferred the financing proceeds would be shared with Fiechter receiving 25% of the net proceeds which would be applied as partial payment of the $1,050,000. Fiechter was assured by Wescott that the strategy was in his best interest and that he would be assured of payment because of Wescott's high net worth and ability to pay $1,050,000 even if Wescott had to hold ownership of 162 Glen Court beyond one year. Based on the Wescott strategy, and in reliance on the written financial representations Wescott had previously made to Fiechter, including the September 30, 2008 financial statement given to Fiechter on or about January 20, 2009 showing Wescott's net worth to be over $62 million, Fiechter transferred ownership of 162 Glen Court to Wescott on or about January 27, 2009 and took back an unsecured promissory note for $1,050,000 (**the "Glen Court Note"**). Wescott paid no cash to Fiechter for the transfer of ownership. The Glen Court Note provides, *inter alia*, that reasonable attorneys fees and costs incurred in connection with the collection or enforcement of the Note are recoverable.

22. On or about April 10, 2009, Wescott obtained a hard-money loan for $600,000 secured by 162 Glen Court. Wescott paid Fiechter $140,134 in April 2009 and the Glen Court Note was reduced accordingly. Wescott eventually defaulted on the hard-money loan secured by 162 Glen Court and, Fiechter is informed and believes, transferred ownership to the lender in lieu of foreclosure. Wescott kept the loan proceeds of approximately $450,000 and never made further payment on the Glen Court Note to Fiechter.

23. On September 20, 2009 Wescott gave Fiechter a **fifth written financial**

- 6 -

**statement**. This Statement was dated August 20, 2009 and listed numerous assets, both domestic and foreign, with a purported value of $132,549,957, and liabilities of $76,559,891, for a total net worth of $76,559,891.

24. On November 7, 2009 Fiechter made formal written demand that Wescott immediately repay the Consolidated Note and the Glen Court Note. Wescott failed to make payment of either.

25. On October 25, 2010 Fiechter brought suit in Nevada to collect the balance owing on the Glen Court Note, alleging, among other things, fraud and breach of contract. Default judgement was entered against Wescott in the amount of $921,174.24 principal, $338,907.80 interest, $8,865 costs, and $6,626.25 attorneys fees. The Nevada judgment was entered as a sister-state judgment in the California Superior Court in and for San Francisco on September 6, 2011 in the total amount of $1,3050,058. No portion of this judgment has been paid.

26. On January 15, 2010 Fiechter brought suit in the California Superior Court in and for San Francisco to collect on the Consolidated Note, alleging, among other things, fraud and fraudulent conveyance of assets. This case was set for trial on February 27, 2012. The proceedings have been stayed by application of the automatic stay in effect as a consequence of the bankruptcy petition filed by Wescott and Stephens on January 17, 2012.

### FIRST CLAIM FOR RELIEF
### 11 U.S.C. § 523 (a) (2)(B)
### (Obtaining Money By Materially False Statements in Writing - The Consolidated Note)

27. By this reference, Fiechter incorporates the allegations of Paragraphs 1 - 26 above as though fully stated herein.

28. On February 25, 2008 Wescott, and Stephens as her community property, obtained $400,000 from Fiechter and gave him the February 2008 Note in return.

29. The aforementioned $400,000 was obtained by means of a statement in writing, namely the February 2008 written statement of assets provided to Fiechter by Wescott as referenced

- 7 -

above in Paragraph 14 representing that Wescott and Stephens had real estate equity of over $22.5 million.

30. On May 7, 2008 Wescott, and Stephens as her community property, obtained an extension, renewal and refinancing of the $400,000 February 2008 Note and the balance owed on the March 2007 Note, and caused Fiechter to accept the Consolidated Note for $550,000 principal and $19,901 interest.

31. The aforementioned extension, renewal and refinancing, and the Consolidated Note, were obtained by means of statements in writing, namely: (i) the February 2008 written statement of assets as referenced in Paragraph 14 above that Wescott and Stephens had real estate equity of $22.5 million; and, (ii) the April 17, 2008 financial statement as referenced in Paragraph 15 above that Wescott and Stephens had a net worth of $28,253,119.

32. At or about the time the Consolidated Note matured on July 15, 2008, Wescott, and Stephens as her community property, obtained an indefinite extension of payment on the Consolidated Note and caused Fiechter to not demand that it be paid on the maturity date.

33. The aforementioned extension of the Consolidated Note due date was obtained by means of statements in writing, namely: (i) the February 2008 written statement of assets as referenced in Paragraph 14 above that Wescott and Stephens had real estate equity of $22.5 million; (ii) the April 17, 2008 financial statement as referenced in Paragraph 15 above that Wescott and Stephens had a net worth of $28,253,119; (iii) the May 14, 2008 financial statement given to Fiechter on July 3, 3008 as referenced in Paragraph 16 above that Wescott and Stephens had a net worth of $51,346,834; (iv) the September 20, 2008 financial statement given to Fiechter on January 20, 2009 as referenced in Paragraph 19 above that Wescott and Stephens had a net worth of $62,675,831; and, (v) the August 20, 2009 financial statement as referenced above in Paragraph 23 above that Wescott and Stephens had a net worth of $76,559,891.

34. Fiechter is informed and believes, and thereon alleges, that each of the five financial statements are materially false, and were materially false when made, in overstating the value of assets, not disclosing liabilities (actual and contingent) attributable to listed assets and otherwise

materially inflated the purported net worth of Wescott and Stephens at the time the financial statements were given to Fiechter.

35. The Debtors knew that the financial statements were false and inflated when made, and further knew that Fiechter accepted the statements as true and made with honest intent, and further knew that Fiechter relied on the statements in making loans and extending payment dates as stated herein.

36. Fiechter reasonably relied on the financial statements in making the February 25, 2008 loan, consolidating the February 2008 Note with the March 2007 Note balance in the Consolidated Note and in extending the payment date of the Consolidated Note indefinitely after July 15, 2008.

37. The debt owed to Fiechter on account of the Consolidated Note is $564,516 principal, and unpaid interest in the amount of $186,490 at the legal rate of 10%.

38. The Debtors obtained the debt owed on account of the Consolidated Note, and extensions, renewal and refinancing as alleged above, by making materially false written statements concerning their financial condition, made with the intent to deceive, on which Fiechter reasonably relied in making the loans, extensions, renewals and refinancing as alleged above, making the Debtors' indebtedness on the Consolidated Note non-dischargeable in bankruptcy pursuant to 11 U.S.C. §523(a)(2)(B).

**SECOND CLAIM FOR RELIEF**
**11 U.S.C. § 523 (a) (2)(B) and (a)(4)**
**(For Fraud While Acting in a Fiduciary Capacity, Embezzlement,**
**and Obtaining Money By Materially False**
**Statements in Writing - The Florida Profit Split)**

39. By this reference, Fiechter incorporates the allegations of Paragraphs 1 - 38 above as though fully stated herein.

40. At all times mentioned herein, Wescott acted as a real estate broker in arranging for the loan transaction to the Florida developer as alleged above in Paragraph 13 and at all times mentioned therein was a fiduciary of Fiechter by reason of his real estate broker status and by further reason of his complete control of the funds advanced by Fiechter and receipt of the

- 9 -

repayment from the Florida developer of principal and excess funds to be split 50/50 by Fiechter and Wescott.

41. Wescott breached his fiduciary duty to Fiechter by willfully and maliciously ignoring his agreement with Fiechter when payment was made by the Florida developer, by spending $55,000 of the Florida Profit Split attributable and distributable to Fiechter without Fiechter's knowledge, consent or agreement.

42. Wescott was permitted by Fiechter and entrusted to directly receive payment from the Florida developer and then divide payment of such funds to Fiechter and Wescott pursuant to their agreement whereby Fiechter would first receive the principal amount advanced and then split profits 50/50. Instead of splitting the money in his possession and control in accordance with the agreement, Wescott embezzled and took an excess profit share of $55,000 for his own account and failed to pay Fiechter his full profit share.

43. The excess profit share of $55,000 was obtained by means of a breach of fiduciary duty and embezzlement for the benefit of both Wescott and Stephens as their community property, and has not been repaid to Fiechter.

44. Wescott, and Stephens as her community property, obtained an extension of the payment date of the Florida Profit Share, by means of the materially false financial statements as stated in Paragraphs 33, 34 and 35 above, and Fiechter consented to receiving payment with payment of the Consolidated Note relying on the truthfulness and accuracy of the financial statements.

45. The Debtors took Fiechter's Florida Profit Share of $55,000 by means of fraud and intentional acts while Wescott was acting as a fiduciary, and by further means of embezzlement of funds entrusted to Wescott for distribution to Fiechter; and Debtors obtained extensions, renewals and refinancing of the Florida Profit Share payable to Feichter by making materially false written statements concerning their financial condition, made with the intent to deceive, on which Fiechter reasonably relied as alleged above, making the Debtors' indebtedness to Fiechter on the Florida Profit Share non-dischargeable in bankruptcy pursuant to 11 U.S.C. §§523(a)(2)(B) and 523(a)(4).

- 10 -

# THIRD CLAIM FOR RELIEF
## 11 U.S.C. § 523 (a) (2)(B) and (a)(4)
### (For Fraud While Acting in a Fiduciary Capacity, Embezzlement, and Obtaining Money By Materially False Statements in Writing - Glen Court Note)

46. By this reference, Fiechter incorporates the allegations of Paragraphs 1 - 45 above as though fully stated herein.

47. On or about January 27, 2009, with Wescott acting as his real estate broker, fiduciary and advisor, Fiechter transferred ownership of 162 Glen Court to Wescott without any cash compensation and in exchange for an unsecured Promissory Note payable in one year in the principal amount of $1,050,000 with the promise that if financing was obtained by Wescott that the proceeds would be shared with 25% going to reduce the Glen Court Note.

48. Fiechter transferred ownership of 162 Glen Court in direct reliance on the representation of Wescott that the transfer was in the best interests of Fiechter and was the best real estate strategy to maximize Fiechter's income from the property instead of Fiechter selling, listing, renting or simply holding the property for future sale. In agreeing to the real estate strategy devised by Wescott, Fiechter relied on Wescott as a licensed real estate broker and as his fiduciary, and further relied on the materially false written financial statements of Wescott, including, but not limited to, the September 30, 2008 financial statement given to him by Wescott on or about January 20, 2009 which showed that Wescott and Stephens had a total net worth of over $62 million.

49. Wescott obtained a hard-money loan for $600,000 in April 2009 secured by 162 Glen Court and retained approximately $450,000 of the funds. Fiechter was paid $140,134 from the loan proceeds, but never received anything further on account of transferring 162 Glen Court to Wescott and Wescott eventually lost the property when he defaulted on the loan either by foreclosure or a transfer to the hard-money lender in lieu of foreclosure.

50. By means of the "real estate strategy" devised by Wescott, Wescott was able to obtain real property as a fiduciary of Fiechter at no cost, obtain borrowed funds of approximately $450,000, and allowed the property entrusted to him by Fiechter to be lost to foreclosure without repayment of the Glen Court Note and without payment even of the $450,000 loan proceeds received by Wescott. By obtaining possession and ownership of 162 Glen Court in the manner

devised by Wescott, Wescott embezzled the ownership from Fiechter and converted the value of 162 Glen Court for his own benefit and to the detriment of Fiechter and at no cost to Wescott.

51. The Debtors took Fiechter's 162 Glen Court property by means of fraud while acting in a fiduciary capacity and by means of embezzlement, and converted the use of the property for their own purposes and obtained financing proceeds of approximately $450,000 at not cost, and did so by making materially false written statements concerning their financial condition, made with the intent to deceive, on which Fiechter reasonably relied as alleged above, making the Debtors' indebtedness to Fiechter on the Glen Court Note non-dischargeable in bankruptcy pursuant to 11 U.S.C. §§523(a)(4) and 523(a)(2)(B).

**WHEREFORE,** Frederick C. Fiechter requests judgment under the above counts as follows that:

1. The debt of $564,516 pursuant to a Promissory Note dated May 7, 2008 (the Consolidated Note) with accrued interest at the legal rate of 10% through the date of this complaint of $186,490, and interest thereafter at the legal rate, is non-dischargeable, and that Plaintiff Fiechter have judgment in said amount against Defendants.

2. The debt of $55,000 for Plaintiff's profit share from a joint venture loan retained by Wescott on or about September 2, 2008 with accrued interest through the date of this complaint of $19,954, and interest thereafter at the legal rate, is non-dischargeable, and that Plaintiff Fiechter have judgment in said amount against Defendants.

3. The debt of $1,305,058, plus interest at the legal rate of 10% from August 26, 2011 (the date judgment was entered in The Superior Court of California in and for San Francisco) of $84,739 on account of the Glen Court Note is non-dischargeable, and that Plaintiff Fiechter have judgment in said amount against Defendants.

|   |   |   |
|---|---|---|
| 1 | 4. | Reasonable attorneys fees incurred by Plaintiff Fiechter in the enforcement and collection of sums due and owing pursuant to the Consolidated Note and the Glen Court Note be awarded to Plaintiff. |
| 4 | 5. | Such other and further relief as is just and appropriate, including reasonable costs incurred herein be ordered. |

Dated: April 19, 2012

            LESS & WEAVER

            GUY KORNBLUM & ASSOCIATES

            By: Robert N. Weaver, Esq.
            Attorneys for Frederick Charles Fiechter